BANK OF PERRY v. E. H. COOKE *et al.*

1. CHATTEL MORTGAGE—*Possession.* Where at the time of the execution of a chattel mortgage, it is understood and agreed between the parties that the mortgagor shall be allowed to remain n possession of the mortgaged property and sell and dispose of the same in the ordinary course of trade and apply the proceeds to his own use, the mortgage is absolutely void as to creditors of the mortgagor.

2. SAME. It does not matter whether such agreement is oral or in writing, contained within the mortgage or without, if such an agreement was had, the mortgage is fraudulent and void as to creditors.

*Error from the District Court of P County.*

STATEMENT OF THE CASE.

On the 9th day of February, 1894, Brogan & Jackson, a firm composed of J. M. Brogan and Junius E. Jackson, at the city of Perry, in P county, executed a certain chattel mortgage to the Bank of Perry for the sum of $425, due in ten days after date, and secured the same on the entire stock of groceries, flour, feed, etc., of the said firm. Said mortgage was, on the 20th day of February, 1894, filed in the office of the register of deeds of said county at 4:30 o'clock P. M.

On the 10th day of February, 1894, J. E. Jackson made, executed and delivered to the Bank of Perry, Perry, O. T., a certain chattel mortgage on all of the stock of groceries, tobacco, etc., of the said Jackson, to secure the sum of $225, due in thirty days after date, said mortgage being filed for record on the 20th day of February, 1894, at 4:30 P. M.

On the 9th day of February, 1894, Brogan & Jackson were partners, doing a general merchandise business.

On the 10th day of February, 1894, the said firm dissolved partnership, J. E. Jackson assuming control of the business.

On the 20th day of February, 1894, J. E. Jackson made, executed and delivered to E. H. Cooke, a certain chattel mortgage on the entire stock of goods of the said Jackson, to secure the sum of $700, due on demand, said mortgage being filed for record in the office of the register of deeds of said P county, on the 20th day of February, 1894, at 5 o'clock P. M., said mortgage being subject to said mortgages to the Bank of Perry.

(At 4 o'clock P. M. on the 20th day of February, 1894, the plaintiff. in error took possession of the stock of goods in question, under the mortgages above set out.)

On the same day, Nix, Halsell & Co., Henry Flock and Reid, Murdock & Co., levied upon the stock of goods in question, under an order of attachment, in the order named. Following these attachment creditors, E. H. Cooke filed his chattle mortgage on said stock, and Dale & Nessly, Armour Packing Co. and Symns Grocery Co. followed with writs of attachment in the order named.

On the 11th day of June, 1894, a jury being waived, a trial was had before the court, and the court made the following findings of fact and conclusions of law:

### FINDINGS OF FACT.

"1. On February 8, 1894, J. E. Jackson, being indebted to E. H. Cooke, executed and delivered to Cooke his promissory note payable on demand, for the sum of $700, on which note demand for payment was made on February 20, 1894, and which remains unpaid.

"On February 20, 1894, J. E. Jackson executed and delivered a chattel mortgage to E. H. Cooke on a certain stock of groceries with all fixtures, furniture and goods of every kind and character in the store room

in Perry, P county, Oklahoma Territory, theretofore owned and managed by Brogan & Jackson, the Jackson of said firm being J. E. Jackson who executed this mortgage. The mortgage contained provisions authorizing the mortgagee to take possession of the property at any time he should feel unsafe and insecure. It also contained a provision and said mortgagor hereby represents that he is the sole and exclusive owner of the property above described, and that there is no other mortgage or lien of any kind thereon except to the Bank of Perry. This chattel mortgage was executed in Oklahoma City, Oklahoma Territory, and on the afternoon of the same day Jackson and Cooke both came to Perry, arriving in Perry about 5 o'clock, P. M. E. H. Cooke went to the Bank of Perry and from there to the register of deed's office, where he filed the chattel mortgage at 5 o'clock, P. M.

"2. On February 9, 1894, J. M. Brogan and J. E. Jackson were partners engaged in the mercantile business in the city of Perry, having a stock of groceries, flour, feed, etc., and were largely indebted to numerous wholesale merchants for goods bought on credit.

"On the same day, February 9, 1894, J. E. Jackson went to the Bank of Perry, in Perry, O. T., said bank being a banking institution of which T. K. Robinson was president and F. W. Farrar was cashier, and borrowed of said bank the sum of $425 and gave therefor his note payable ten days after date, and to secure the same gave a chattel mortgage signed by Brogan & Jackson, per J. E. Jackson, Partner. This mortgage contained provisions authorizing the mortgagor to remain in possession of the goods and property mortgaged. Also contained a provision that in case of default in payment of the note at maturity or in case the mortgagee should at any time feel unsafe or insecure, 'it shall be entitled to and may take and hold possession of said mortgaged property, at the expense of the mortgagors, until the payment of the note or performance of the act for the performance of which the mortgage is security.'

"On the 10th day of February, 1894, the firm of Brogan & Jackson having dissolved partnership on that day, J. E. Jackson succeeding said firm, said J.

E. Jackson again went to the Bank of Perry and borrowed, in his own name, the sum of $250, and gave therefor his note payable in 30 days after date, and another chattel mortgage on the same stock of merchandise as the first, said chattel mortgage being in the same form and containing the same conditions as the mortgage made on the 9th day of February by Brogan & Jackson.

"These mortgages were signed in the presence of T. K. Robinson, the president of the said bank, but not in the presence of any other person, and were not signed by attesting witness in the presence of Jackson, but afterwards T. K. Robinson and V. C. Talbert signed the mortgages as attesting witnesses, Jackson not being informed or knowing that said parties so signed the mortgage as attesting witnesses.

"By agreement between the Bank of Perry, through T. K. Robinson as president, and J. E. Jackson, these mortgages were retained by the bank and not filed of record until the 20th day of February, 1894, at 4:30 o'clock P. M., for the reason that if said mortgages were so filed they would injure and ruin the commercial credit of J. E. Jackson.

"3. J. E. Jackson continued to run his mercantile business and buy and sell goods and merchandise in the usual course of trade after said mortgages were given, the same exactly as before, no notice of any kind being given to any person of said chattel mortgages until the 20th day of February, 1894, the goods being sold from said stock and new goods bought and placed therein daily, some of the purchases being made during that time from Nix, Halsell & Co., and some from the Armour Packing Co., and during the time from the 10th of February, 1894, to and including the 20th day of February, 1894, before these mortgages were filed for record, more than $700 worth of goods and more than the amount of the notes and interest given to the bank of Perry was sold from this stock of goods by J. E. Jackson, no account being kept of the same excepting of the amount of the proceeds of such sales, which were deposited by J. E. Jackson in the Bank of Perry, $465 of such amount being deposited in the Bank of Perry, $100 of the amount of such sales was retained by J. E. Jackson

and the balance of the proceeds of such sales being expended in the purchase of goods for said store and in running expenses of said store and other expenses of said J. E. Jackson.

"From February 10, 1894, to February 17, 1894, exclusive, J. E. Jackson deposited in the Bank of Perry the sum of $1,001.50, of which sum there remained in the Bank of Perry to the credit of J. E. Jackson, on the 20th day of February, 1894, the sum of $155.74.

"4. On the 19th day of February, 1894, J. E. Jackson went to Oklahoma City, Oklahoma Territory, leaving in charge of said store W. G. Shapland, as clerk in said store. Said Shapland was given no authority whatever to turn the possession of said store over to the Bank of Perry or to any other person.

"5. Shortly after 4 o'clock on the 20th day of February, 1894, F. W. Farrar, cashier of the Bank of Perry, deeming the bank insecure in its claim of a chattel mortgage lien on said stock of goods under the said two mortgages of February 9 and 10, 1894, went to the store and place of business of J. E. Jackson and found W. G. Shapland in charge and possession thereof, and demanded possession of the store under said chattel mortgages, and said Shapland, believing that said Farrar had or would have an officer with him to enforce his demand, delivered the key to the front door of the store to said Farrar, but refused to deliver the possession of the store to said Farrar, and said Shapland, together with Miss Harbalds, another clerk in said store, remained in the store building and in possession of said store, together with one Hart, who had come to said store with said Farrar to procure said possession, and the front door of the store was locked at that time. Some of the goods of said stock, when the door was locked, were left outside in front of said place of business, as usual.

"6. On the 20th day of February, 1894, and at the time F. W. Farrar went to the store of J. E. Jackson to obtain possession of said stock, J. M. Brogan and J. E. Jackson, as partners, and J. E. Jackson, since the dissolution of the partnership, in the name of Brogan & Jackson, no notice of such dissolution having

been given the creditors, so far as the evidence shows, were indebted to numerous parties, among others, in the following amounts, to wit:

Nix, Halsell & Company .................................................. .........$954.49
Henry Flock ........................................................... ........ 370.00
Reid, Murdock & Company.......... .......................... ............. 986.17
Dale & Nessly ............ .......... ......................... ..................... .. 203.89
Armour Packing Company ........ ......... .............................. 249.08
Symns Grocery Company .. ........ ............ ................... ........... 429.11

"Said creditors being entirely insecured.

"Immediately after the front door of the store was locked an order of attachment, issued out of the probate court of P county, Oklahoma Territory, in the suit of Nix, Halsell & Co., against Brogan & Jackson, for the sum of $954.49 and costs, was delivered to the sheriff. who immediately proceeded to the store of said Jackson and the former place of business of Brogan & Jackson, and immediately thereafter and within a very few minutes and while the sheriff was at the door of said store, orders of attachment were also delivered to the sheriff in the case of Henry Flock and Reid, Murdock & Co., which were attachment suits brought to recover the accounts of said creditors against Brogan & Jackson. The sheriff immediately seized upon the goods on the outside of the store and the door being closed and he being unable to obtain admittance, declared that he attached said goods on the outside of the store and the goods in the store under and by virtue of said writs of attachment; and the sheriff remained at the door of said store, that is, the deputy sheriff so did, until when, a short time thereafter and about five o'clock, J. E. Jackson came to the store and delivered to the sheriff the key to the doors and the store was unlocked and the sheriff entered the store with said writs of attachment and remained in the above possession of the same, the sheriff and Farrar agreeing then that the matter should rest as it was until indemnity bonds should be given, which bonds were given the next day and the goods and property were inventoried and appraised under the writs of attachment.

"When the sheriff, with J. E. Jackson, and representatives of the creditors, entered the store, Farrar

was there, and J. E. Jackson and his clerk, W. G. Shapland, both protested that Farrar had no right to take possession of said stock and both refused to give the said Farrar possession of said stock under the two mortgages to the Bank of Perry.

"7. The writ of attachment in the case of Nix, Halsell & Co. was levied on the outside of the store by taking possession of the goods there and by declaration of the sheriff that he attached the goods within, at 4:28 o'clock P. M. of said day, and the same proceeding was had under the Henry Flock·order at 4:29 o'clock. The mortgages to the Bank of Perry were filed at 4:30; the order of attachment in the case of Reid, Murdock & Co., was levied in a similar manner at 4:41 o'clock in the afternoon of said 20th day of February, 1894; the mortgage to E. H. Cooke ·was filed at five o'clock P. M. February 20, 1894; at 5:13 o'clock P. M. February 20, 1894, a writ of attachment was delivered to the sheriff in the case of Dale & Nessly against Brogan & Jackson, upon their claim; and at 10:07 o'clock A. M., February 21, 1894, a writ of attachment was delivered to the sheriff upon the claim of the Armour Packing company against Brogan & Jackson; and February 23, 1894, at 10:08 A. M., a writ of attachment was also delivered to the sheriff in the case of Symns Grocery company against Brogan & Jackson. The goods were held by the sheriff and were sold by him under the order of the probate court in said various attachment suits and said goods sold for $3,700, which money is in the hands of the receiver appointed in this cause.

"8. On the 22d day of February, 1894, judgments were taken in the probate court for the amounts of the claims stated in the case of Nix, Halsell & Co., Henry Flock and Reid, Murdock & Co. against Brogan & Jackson, and on the 5th day of June, 1894, judgment was taken for the amount of the claim of Dale & Nessly. The suits of Armour Packing Company and Symns Grocery Company are still pending. The attachments and all of the suits in which judgment was taken were sustained; in the others, not determined, the attachments are still in force and not dissolved.

"9. That the chattel mortgage made by J. E. Jack-

son, for Brogan & Jackson, on February 9, 1894, and the chattel mortgage made by J. E. Jackson, on February 10, 1894, both to the Bank of Perry, were made by both J. E. Jackson and the Bank of Perry with the fraudulent intent to hinder and delay the creditors of Brogan & Jackson and J. E. Jackson, and with the fraudulent intent and purpose to deprive the creditors of Brogan & Jackson and J. E. Jackson of their rights as such creditors.

"To which findings of fact, and each and every one thereof, the Bank of Perry excepts."

## CONCLUSIONS OF LAW.

"1. The court concludes, as a matter of law, that the chattel mortgages made by J. E. Jackson to the Bank of Perry, on the 9th and 10th of February, 1894, were fraudulent and void as to the creditors of Brogan & Jackson and J. E. Jackson.

"2. That the mortgage made to E. H. Cooke by J. E. Jackson was given subject to the mortgages of the Bank of Perry, but that, on account of fraud in the transactions between the Bank of Perry and J. E. Jackson as against the creditors of Brogan & Jackson and J. E. Jackson, the attachment creditors of J. E. Jackson procured a lien upon the assets of the insolvent debtors, which was prior to the lien of the Bank of Perry, and to place the claim of E. H. Cooke subject to the claim of the Bank of Perry would wholly defeat the claim of said E. H. Cooke, on account of there not being sufficient proceeds to pay the other claims which are, on account of fraud, prior to the Bank of Perry, and E. H. Cooke being in no way responsible for the fraudulent conduct of the Bank of Perry, by which other creditors were given priority over the claim of the Bank of Perry, in equity, the claim of E. H. Cooke must be paid prior to the Bank of Perry and so as not to defeat the lien and claim of E. H. Cooke because of such fraudulent conduct of the Bank of Perry.

"3. That the chattel mortgages made by Brogan & Jackson and J. E. Jackson to the Bank of Perry, on the 9th and 10th days of February, were not signed

in the presence of two attesting witnesses, so as to entitle them to be placed of record, and no notice was given thereby.

"4. That all of the attachments in this case are senior and superior liens on the fund derived from the sale of said goods to that of the Bank of Perry, and the order of priority of the claims of said creditors of Brogan & Jackson and J. E. Jackson is as follows:

"1. Nix, Halsell & Co.

"2. Henry Flock.

"3. Reid, Murdock & Co.

"4. E. H. Cooke.

"5. Dale & Nessly.

"6. Armour Packing Company.

"7. Symns Grocery Company.

"8. The Bank of Perry.

"A. G. C. BIERER, Judge."

The Bank of Perry appeals.    Judgment affirmed.

*Keaton & Cotteral*, for plaintiff in error.

*Selwyn Douglas* and *MacGregor Douglas*, for E. H. Cooke.

*Cunningham & DeBois*, for Reid, Murdock & Co.

### OPINION OF THE COURT.

The opinion of the court was delivered by

SCOTT, J.:  The petition in error states nine assignments of error, but in the brief but four are argued and brought to the attention of the court.  Without taking up the assignments of error in the order in which they are presented, we will say at the outset, that if the Bank of Perry's mortgage is void as to the creditors of Brogan & Jackson and J. E. Jackson, the plaintiff in error can not complain.  Naturally the first question which presents itself is:  Was the mortgages executed by Brogan & Jackson and J. E. Jackson, to the Bank of Perry, in law, void, or given with

the intent to hinder, delay and defraud the creditors of the said Brogan & Jackson and J. E. Jackson?

The evidence shows, and the court so finds, "that these mortgages were retained by the bank and not filed of record until the 20th day of February, 1894, at 4:30 o'clock P. M., for the reason that if said mortgages were so filed, they would injure and ruin the commercial credit of J. E. Jackson." The court further finds that :

"J. E. Jackson continued to run his mercantile business and buy and sell goods and merchandise in the usual course of trade after said mortgages were given, the same exactly as before, no notice of any kind being given to any person of said chattel mortgages until the 20th day of February, 1894, the goods being sold from said stock and new goods bought and placed therein daily, some of the purchases being made during that time from Nix, Halsell & Co. and some from the Armour Packing Co., and during the time from the 10th of February, 1894, to and including the 20th day of February, 1894, before these mortgages were filed for record, more than $700 worth of goods and more than the amount of the notes and interest given to the Bank of Perry, was sold from this stock of goods by J. E. Jackson, no account being kept of the same excepting of the amount of the proceeds of such sales which were deposited by J. E. Jackson in the Bank of Perry, $465 of such amount being deposited in the Bank of Perry, $100 of the amount of such sales was retained by J. E. Jackson and the balance of the proceeds of such sales being expended in the purchase of goods for said store and in running expenses of said store and other expenses of said J. E. Jackson."

From this statement can the Bank of Perry, mortgagee, have a prior and valid lien upon the stock of goods in question, as against the creditors of Jackson who claimed by mortgage or attachment lien? This is not a new question, but has been passed upon by nearly every court in the country and from a very early day in our jurisprudence. Many of the courts

have disagreed and a conflict of authorities has arisen, but the disagreement has arisen principally upon the question when an instrument allowing the mortgagor to remain in possession and deal with the property as his own, is absolutely void upon its face as a matter of law, or whether it is fraudulent *per se*, the power to sell being only evidence of a fraudulent intention which should go to the jury along with other questions of fact affecting the transaction. In this case the question was submitted to the court and a jury waived, and the court found that there was fraud. We are asked to review the judgment of the court upon the facts and to say that the conclusions of law are incorrect.

In determining this question we take it that it is unnecessary to enter upon a long discussion of the principles involved or to quote at length from the authorities. While there has been some difference in many of the courts as to whether such a mortgage as given in this case, not followed by possession of the mortgagee, is absolutely void or simply a badge of fraud, or whether it is a question for the jury, yet in this case there can be but little doubt. The court found upon the facts that the mortgage was fraudulent and given for the purpose of hindering and defrauding the creditors of the mortgagor, Junius E. Jackson and John Brogan.

Plaintiffs in error cite but one authority to sustain their position—*Black Hills Mercantile Co. v. Gardiner et al*, 58 N. W. Rep. 557. This case does not seem to be upheld by the weight of authority. In that case on the 3d of May, 1892, a mortgage was given on a stock of goods for $1,950 and on the 6th day of May, 1892, another mortgage was given on said stock for $1,790, the second mortgage was filed for record on May 24, and the other on May 23. From the time of the execution of the mortgage until the attachments, the

mortgagors were allowed to remain in possession of the stock the same as before the mortgages were given, and sold goods in the ordinary course of trade and retained the proceeds. The mortgages contained no clause allowing the mortgagors to remain in possession, but the mortgagees allowed them to do so. The supreme court held that the mortgages were good and that the evidence did not show any fraud. Plaintiffs in error rely upon this case as presenting the law on the subject.

This question has never been definitely settled in this court, and, therefore, we should with care endeavor to arrive at the proper conclusion in the matter. Courts have disagreed upon the question involved and there is a great mass of irreconcilable decisions on the subject. It is impossible to harmonize them, and it will be useless for us to try to do so. We will simply try to arrive at a just conclusion in the matter and have our opinion supported by the weight of authority and the better reasoning on the subject, as we take it.

Chief Justice Bronson, in *Griswold v. Sheldon*, 4 N. Y. 581, early announced the doctrine that a mortgage of the character in question was fraudulent and void. While the decision of the court was not unanimously concurred in, yet, since that time the doctrine has been well settled in that state. The chief justice in that case says:

"But if the intention to allow Burdick to dispose of the mortgaged property as owner cannot be gathered from the face of the deed, still the goods were left in his possession, and he was, in fact, allowed to deal with them as owner, and disposed of them as a merchant to his customers, from the date of the conveyance down to the time of the levy. Such a transaction the law always has, and I trust always will, pronounce a fraud upon creditors and purchasers."

In *Southard v. Brenner*, 72 N. Y. 424, the court, in discussing the subject, says:

"Where, at the time of the execution of a chattel mortgage upon a stock of merchandise, it is understood and agreed between the parties that the mortgagor may go on and sell the stock and use the proceeds, generally, in his business, and the agreement is carried out by permitted sales, the transaction is fraudulent in law as against the creditors of the mortgagor."

And again in the same decision the learned court use the following language which expresses the correct doctrine, as we think:

" Such an agreement included in and making a part of the written instrument of mortgage would clearly invalidate it as fraudulent in law, as that term is understood; that is, would be conclusive evidence of fraud in fact, and would be so held by the court as a matter of law. This was decided in *Edgell v. Hart* (5 Seld. 213.) Whether the agreement is in or out of the mortgage, whether verbal or in writing, can make no difference in principle. Its effect as characterizing the transaction would be the same. The difference in the modes of proving the agreement cannot take the sting out of the fact and render it harmless. If it is satisfactorily established, the result upon the security must be the same. It is the fact that such an agreement has been made and acted upon that in law condemns the security, and not the fact that it is proved by the instrument of security, instead of by parol or in some other way."

In *Potis, Administrator, v. Hart*, 99 N. Y. 168, the court use the following language:

"A chattel mortgage is fraudulent and void as to creditors where it was given with the tacit or express understanding and arrangement that the mortgagor may sell and dispose of the mortgaged property, and apply the avails to his own use. Such an agreement may be inferred from the fact, that the mortgagor does, with the knowledge and assent of the mortgagee

so sell and dispose of the property and apply the avails."

In the same case the court after discussing the proposition as to allowing the mortgagor to remain in possession and sell and apply the proceeds to his own use, says:

"The parties to a mortgage cannot thus play fast and loose with the mortgaged property and thus hinder and delay creditors."

Chief Justice Ryan of Wisconsin, one of the ablest judges that court ever had, in the case of *Blakslee v. Rossman*, 43 Wis. 124, in reviewing this question, except that the mortgagor was allowed to retain one-half of the proceeds of the sale for his own use, and apply the other half to the payment of the mortgage debt, says:

"But we prefer to rest our judgment on the ground first stated. The license given to the mortgagor to retain half the proceeds and use them at his pleasure, makes the written contract of the parties fraudulent and void in law as against creditors; absolutely void as to them, beyond all aid from extrinsic facts. Parol evidence can make it neither better nor worse. Intent does not enter into the question. Fraud in fact goes to avoid an instrument otherwise valid. But intent, *bona fide* or *mala fide*, is immaterial to an instrument *per se* fraudulent and void in law. The fraud which the law imputes to it is conclusive. So a fraudulent agreement of parties, by parol, goes as fraud in fact to impeach a written instrument valid on its face. Fraud in fact imputed to a contract is a question of evidence, not fraud in law. And no agreement of the parties in parol can aid a written instrument fraudulent and void in law. (*Wood v. Lowry*, 17 Wend. 492; *Edgell v. Hart*, 9 N. Y. 213; *Robinson v. Elliott*, 22 Wall. 513.)"

It was said by the supreme court of Ohio as early as 1847, in the case of *Collins and McElroy v. Myers*, 16 Ohio, 547:

"A mortgage upon a specific article with possession

and power of disposition left in the mortgagor, is in truth no mortgage at all; it is no certain lien. The power to hold possession and dispose of the property, is inconsistent with the very nature of a mortgage. It indeed would not perhaps be going to far to say that such an instrument was a nullity. It is the next thing to a sale of a horse with possession and power of disposition retained to the vendor. Except in the case of a mortgage, it would be contended that a time might happen when the mortgagee could assert possession; but before condition broken and possession taken, it would be hard to discover any difference. \* \* \* As to all the world except as to the parties themselves, such a mortgage will be held void, as against the policy of the law."

It was further said in the case just cited that there was no specific lien, but a floating mortgage, which attaches, swells and contracts, as the stock in trade changes, increases and diminishes.

It was held by the supreme court of Kansas, in the case of *Leser v. Glaser*, 4 Pac. 1030, 32 Kan. 546, after quoting the following remarks by James O. Pierce in 17 Amer. Law Rev. 350, *et seq.*:

"All cases in which a power of sale of the goods by the mortgagor is provided for, are, therefore, to be tested by the question whether such sales are to be made in his own behalf and at his own discretion, and with control of the proceeds reserved to him; or whether they are to be made solely in pursuance of the trust as a real one; that is, for the benefit of the grantee or mortgagee, and with provision that the proceeds shall be applied on his debt."

The supreme court, following, says:

"We think there is much reason for the distinction made by Mr. Pierce. The first class of mortgages mentioned by him ought generally to be held void, while the other class of mortgages ought generally to be held valid."

It was held by the supreme court of New Mexico, in the case of *Speigelberg v. Hersch*, 4 Pac. 705; 3 N. M. 185:

"Whatever may have been the motive which actuated the parties to this instrument, it is manifest that the necessary result of what they did do was to allow the mortgagors, under cover of the mortgage, to sell their goods as their own, and appropriate the proceeds to their own purposes; and this, too, for an indefinite length of time. A mortgage which, in its very terms, contemplates such results, besides being no security to the mortgagees, operates in the most effectual manner to ward off other creditors; and where the instrument on its face shows that the legal effect of it is to delay creditors, the law imputes to it a fraudulent purpose. * * * That this fraudulent transaction should be carried on under the forms of law, is simply a scandal to an honorable profession. The law gives no sanction to such arrangements and will hold them void as against creditors, as tending to encourage and sustain frauds, and to hinder creditors in the collection of their just demands."

In the case of *Brasher v. Christophe,* 10 Colo. 284, 15 Pac. Rep. 403, where the same question was under discussion, the court says:

"Whatever the motives of the parties to such a transaction may be, viewed as a moral question in the business of every-day life, its effects are injurious, and in law and equity such agreements are fraudulent *per se* as against creditors and subsequent incumbrances."

This question has had the careful consideration of the supreme court of the United States, in the case of *Robinson v. Elliott,* 22 Wall. 512, and it was held by the full bench unanimously that where a mortgagor was allowed to retain the possession of a stock of goods with the power to sell and dispose of the mortgaged property and apply the proceeds to his own use, that the mortgage was absolutely void. The opinion of the court was delivered by Justice Davis, and in commenting upon the question, he uses the following language:

"But the creditor must take care in making his contract that it does not contain provisions of no advantage to him, but which benefit the debtor, and were

designed to do so, and are injurious to other creditors. The law will not sanction any proceeding of this kind. It will not allow the creditor to make use of his debt for any other purpose than his own indemnity. If he goes beyond this, and puts into the contract stipulations which have the effect to shield the property of his debtor, so that creditors are delayed in the collection of their debts, a court of equity will not lend its aid to enforce the contract. These principles are not disputed, but the courts of the country are not agreed in their application to mortgages, with somewhat analogous provisions to the one under consideration. The cases cannot be reconciled, by any process of reasoning, or on any principle of law. As the question has never before been presented to this court, we are at liberty to adopt that rule on the subject which seems to us the safest and wisest.    *    *    *    *

"Whatever may have been the motive which actuated the parties to this instrument, it is manifest that the necessary result of what they did was to allow the mortgagors, under cover of the mortgage to sell the goods as their own, and appropriate the proceeds to their own purposes; and this, too, for an indefinite length of time. A mortgage which, in its very terms, contemplates such results, besides being no security to the mortgagees, operates in the most effectual manner to ward off other creditors; and where the instrument on its face shows that the legal effect of it is to delay creditors, the law imputes to it a fraudulent purpose. The views we have taken of this case harmonize with the English common law doctrine, and are sustained by a number of American decisions."

The courts of Colorado, Illinois, Mississippi, Nevada, Oregon, Tennessee, Texas, Virginia, Washington, West Virginia, Ohio, Wisconsin, New York, New Mexico, Minnesota, Missouri, Pennsylvania, Arkansas, the District of Columbia and the United States supreme court, as well as others, have held that where a mortgagor is allowed to retain the possession of the mortgaged property, with an agreement to sell the same and apply the proceeds to his own use, is absolutely void as against creditors. This doctrine we believe to be

the sound reasoning of the subject, supported by the great weight of authority, and should be announced as the law of this court.

Among the cases which hold to this doctrine are the following: *City Bank v. Goodrich*, 3 Col. 139; *Wilcox v. Jackson*, 7 Col. 521; *Brasher v. Christophe*, 10 Col. 284, 15 Pac. Rep. 403; *Wilson v. Voight*, 9 Col. 614, 13 Pac. Rep. 726; *Greenbaum v. Wheeler*, 90 Ill. 296; *Dunning v. Mead*, id. 376; *Goodheart v. Johnson*, 88 Ill. 58; *Simmons v. Jenkins*, 76 Ill. 479; *Joseph v. Levi*, 58 Miss. 843; *Harmon v. Hoskins*, 56 Miss. 142; *Morrill in re.* 2 Sawyer C. C. 356; *Jacobs v. Erwin*, 9 Ore. 52; *Bremer v. Fleckenstein*, id. 266; *Catlin v. Currier*, 1 Sawyer C. C. 7; *Rome Bank v. Hasleton*, 15 Lea. 216, *McCreasley v. Haslock*, 4 Baxter, 1; *Tennessee Bank v. Ebbert*, 9 Heisk. 153; *Texas Bank v. Lovenberg*, 63 Tex. 506; *Wray v. Davenport.* 79 Va. 19; *Perry v. Shenandoah Bank*, 27 Gratt. 755; *Lang v. Lee*, 3 Rand. 410; *Wineburg v. Schaer*, 2 Wash. 328; *Fox v. Davidson*, 1 Mackey, 102; *Gauss v. Doyle*, 46 Ark. 122; *Gauss v. Orr*, id. 129; *Lund v. Fletcher*, 39 Ark. 325; *Potts v. Hart*, 99 N. Y. 168; *Brackett v. Harvey*, 91 N. Y. 214; *Southard v. Brenner*, 72 N. Y. 424; *Griswold v. Sheldon*, 4 N. Y. 581; *Collins v. Myers*, 16 Ohio, 547; *Blakslee v. Rossman*, 43 Wis. 116; *Steinart v. Duester*, 23 Wis. 136; *Place v. Langworthy*, 13 Wis. 629; *Leser v. Glaser*, 4 Pac. Rep. 1030, 32 Kan. 546; Pierce on Mortgages; *Speigleberg v. Hersch*, 4 Pac. 705, 3 N. M. 185; *Robinson v. Elliott*, 22 Wall. 512; *Twyne's Case*, 3 Coke 90, Smith's Lead. Cases, p. 1; *Freeman v. Rawson*, 5 Ohio St. 1; *Harmon v. Abbey*, 7 Ohio St. 218; *Ball v. Slafter*, 26 Hun. 353; *Putnam v. Osgood*, 52 N. H. 148; *Horton v. Williams*, 21 Minn. 187; *Walter v. Winner*, 24 Mo. 63; *Stanley v. Bruce*, 27 Mo. 269; *White v. Graves*, 68 Mo. 218; *Welsh v. Bikey*, 1 Pa. 57; *Homeer v. Geseman*, 17 S. & R. 251; *Williams v. Lord*, 75 Va. 390; *Mann v. Flower*, 25 Minn. 500.

There is no question from the evidence but what at the time of the execution of the mortgages in ques-

tion, there was an agreement and understanding between the mortgagor and mortgagee that the mortgages were not to be placed of record for some time; that as a matter of fact they were not placed of record for ten days after their execution; that there was a tacit understanding or agreement that the mortgagor should carry on the business in the usual way; that he sold goods and bought others, paid debts and applied the proceeds arising from the sales to his own use. The evidence shows that the average sales per day were over $100, and sufficient was realized from the stock of goods after the mortgages were executed and before they were placed of record and possession taken, to have paid the entire debts of the mortgages.

The mortgages were placed of record at 4:30 o'clock on the 20th day of February, and the first attachment was levied, as shown by the sheriff's return, at 4:28 o'clock P. M., on the 20th day of February, 1894, and the other attachments followed closely thereafter. Under this statement of facts we are asked to hold that the court erred in finding that the mortgages executed to the Bank of Perry were fraudulent and void. It may be contended that the mortgage does not show upon its face, sufficient facts to warrant a court in holding that the mortgage is fraudulent and void, but even conceding this, the facts *aliunde* clearly bring it within the rule, and the court would have erred had it not held the mortgage to have been so. It seems that this case comes clearly within the rule as laid down by the authorities cited, and that it cannot meet the test. The mortgagor undoubtedly was allowed to retain possession of the stock of goods, carry on his business in the usual course of trade and apply the proceeds to his own use. We believe that the better rule is that such a mortgage should be held as absolutely void as to creditors. We do not think that when such a state of facts presents itself it

Decker v. A., T. & S.-F. Rld. Co.

becomes a question of fact as to fraud, but that it is a question of law. Being a question of law we cannot say that the court erred in holding the mortgages void.

Neither is it apparent that plaintiff in error ever gained lawful possession under its mortgages. The finding of fact by the court upon this question is clearly supported by the evidence, and possession thus gained can avail nothing under the law. This being true a discussion of the effect of a lawful possession need not be had.

The other questions raised by counsel are immaterial under this holding of the court, and if well taken, could avail them nothing.

The judgment of the court below will be affirmed.

Bierer, J., having presided below, not sitting; all the other Justices concurring.